IN THE UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF VIRGINIA

NEWPORT NEWS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 4:23cr54 |
| | ) | |
| CHRISTINA MICHELE THOMPSON | ) | |
| | ) | |
| Defendant. | ) | |

FILED IN OPEN COURT
JAN 13 2025
CLERK U.S. DISTRICT COURT
Newport News

### STATEMENT OF FACTS

Comes now the United States and offers to the court that had the above-styled matter proceeded to trial the United States would have proven the following facts beyond a reasonable doubt.

1. Federal law enforcement opened an investigation into LUX AUTO circa June 2021 after receiving information about large-scale drug trafficking activity at the business. Additionally, LUX AUTO was referenced in a separate open FBI investigation into a shooting incident that occurred on or about August 27, 2021, in Hampton, VA where Hampton Police Division officers were targeted by gunfire. The individuals in this superseding indictment were using LUX AUTO as a base of operations on the east coast whilst being supplied by Sources of Supply ("SoS") in California and elsewhere.

2. Video footage obtained from Technical Surveillance of LUX AUTO corroborated the storage of illegal drugs in multiple vehicles throughout the parking lot of LUX AUTO. This surveillance also established that members of the organization were frequently armed with handguns and/or assault style weapons. These weapons were visible on the camera and were recorded. Technical Surveillance at storage units in Newport News also

corroborated the storage of suitcases full of suspected illegal drugs off of the LUX AUTO lot.

3. Law enforcement utilized a wide range of investigative techniques over the course of this multi-year investigation, to include an expansive financial investigation that uncovered over $22,000,000 flowing in and out of various accounts belonging to or associated with the individuals in the superseding indictment and their associates, plus approximately $5,000,000 flowing between Peer to Peer ("P2P") accounts. Various methods of surveillance, controlled evidence purchases, covert-entry search warrants, airport interdictions, and Title-III wire, and data intercepts largely contributed to the overall discovery of a successful, multi-faceted conspiracy to traffic thousands of pounds of illegal marijuana via commercial aircraft into the Commonwealth of Virginia.

4. Between March of 2022 and July 2023, the United States District Court for the Eastern District of Virginia, approved approximately 15 initial and/or renewal Applications for Orders authorizing the interception of wire and/or electronic communications occurring over telephones utilized by various individuals listed in the indictment. During the course of those interceptions, the communications of each individual charged in the indictment were, at times, intercepted and found to be facilitating or discussing the criminal activity of this criminal enterprise. Those communications, marked as "Pertinent" by monitors or reviewers, laid the foundation for a widespread conspiracy dating back approximately seven years.

5. Between August 17, 2020, and January 25, 2023, several monetary seizures occurred at various major airports in the Mid-Atlantic area. Of those seizures, a total of nearly



$400,000 in U.S. currency (cash) was seized from members and/or associates of this criminal enterprise. This currency was either derived from the sale of controlled substances or was intended for the purchase of distribution amounts of controlled substances, primarily being marijuana.

6. Between January 20, 2021, and August 24, 2023, several seizures of illegal marijuana and/or related contraband took place at major airports in the Mid-Atlantic area. To date, almost 1000 pounds of illegal marijuana have been seized through targeted interdiction operations, many of which were developed through monitoring of the aforementioned Title-III wire and data intercepts. According to intercepted conversations and airline records between the dates in the indictment, the organization was trafficking as much as 1000 pounds of marijuana per week into the Commonwealth of Virginia. This is corroborated by the fact that the organization spent more than $500,000 on air travel in support of the movement of marijuana from the SoS to the Commonwealth of Virginia.

7. The members of the organization had varying roles and responsibilities. The leaders of this drug trafficking operation engaged with the sources of supply outside the Commonwealth of Virginia and arranged for the purchase of large loads of marijuana that were the marked for transportation to the Eastern District of Virginia. The leaders would then instruct other members of the organization to arrange for couriers to fly to the SoS, deliver money to them and then return to the Eastern District of Virginia with the marijuana. The leaders would then arrange for mid-level members of the organization to receive the marijuana from the couriers and distribute it to customers or have subordinate dealers sell the marijuana.



8. The leaders of the organization had lieutenants who were responsible for arranging for couriers to travel to the SoS to obtain the marijuana, for obtaining locations to store the marijuana and insuring the ultimate distribution of the marijuana. These lieutenants would sometimes travel to the SoS themselves or would accompany couriers on their travels.

9. The lieutenants supervised individuals who were responsible for distributing the marijuana and sometimes receiving the marijuana from the couriers as they returned from the SoS. These individuals at times were also expected to collect the proceeds from the sale of the marijuana.

10. The couriers would be contacted by members of the organization when the need for marijuana transportation arose. The couriers were provided with tickets to the SoS and usually two suitcases. The couriers would then be transported to various airports in the Eastern District of Virginia for flights to the SoS. The courtiers would take the suitcases, often filled with currency and travel to the SoS. When the couriers arrived at their destination, they would be met by representatives from the SoS and the suitcases would be filled with between 20 and 80 pounds of marijuana. The following day the courtiers would return to the Eastern District of Virginia with the suitcases full of marijuana. When the couriers arrived in the Eastern District of Virginia, members of the organization would either meet them at the airport or arrange for the couriers to Uber to a location where they would surrender the suitcases. The couriers were paid as much as $1,500.00 for these trips.

11. The organization possessed this rough structure of organization over a period of years. However, the role of the individuals in the organization was at times fluid. Organization members were often called upon to perform multiple roles. If a situation arose, a non-courier might be required to travel to the SoS to transport marijuana. Also, some members of the organization, in addition to their tradition role, might need to do paperwork for a flight, deposit drug proceeds into an account or aid in the storage of marijuana.

12. CHRISTINA MICHELE THOMPSON was and is in a relationship with Zuri Reeves. Reeves was active in dealing with the SoSs and was also responsible for the distribution of marijuana to dealers in EDVA. In addition, Reeves would frequently travel to California to organize the movement of couriers to EDVA with suitcases containing large quantities of marijuana.

13. THOMPSON worked with Reeves on achieving the goals of the conspiracy by managing portions of the financial aspects of Reeve's drug operation. THOMPSON also worked with Reeves to launder money she knew was generated from the sale of marijuana. This involved her working with shell companies and moving money between them to disguise the source and amount of the drug proceeds. This all occurred between the dates in the indictment.

14. The court authorized a T-III intercept of Reeves' telephone. During the monitoring of the telephone, THOMPSON was frequently intercepted talking to Reeves about the drug conspiracy. Specifically, on October 6, 2022, THOMPSON and Reeves were intercepted on Reeves' telephone discussing matters related to the distribution of marijuana in furtherance of the conspiracy charged in the second superseding indictment. These events occurred in the Eastern District of Virginia and elsewhere. Marijuana is a Schedule I controlled substance.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

Eric M. Hurt
Assistant United States Attorney
City Center One
11815 Fountain Way, Suite 200
Newport News, Virginia 23606
VA Bar # 35765

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, CHRISTINA MICHELE THOMPSON and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
CHRISTINA MICHELE THOMPSON

I am CHRISTINA MICHELE THOMPSON's attorney and I have carefully reviewed the above Statement of Facts with the defendant. To my knowledge, the decision to stipulate to these facts is an informed and voluntary one.

_____
James O. Broccoletti
Attorney for CHRISTINA MICHELE THOMPSON